He is Keith Lombardo. Good afternoon, everyone. Miss Tapia, is that Tapia? Tapia. Okay. Tapia? Tapia. Okay. We'll be ready. Good afternoon, Your Honors. Thank you for your time. May it please the Court, Marcia Tapia, on behalf of the appellants, I would like to reserve two minutes for rebuttal. Okay. Unless Your Honors want me to begin in any particular place, I would like to start with our first issue of appeal here, which is the 207k exemption, which permits an employer to make an election to utilize a work period of 7 to 28 days. This exception, like other exceptions or exemptions under the Act, must be narrowly construed against the employer. The election to use this exemption must be proved by clear and affirmative evidence and not used as a shield to avoid liability in the eve of litigation. But there's no requirement for, I know you're arguing a requirement for notice, but there's no case law or legislative history or anything else that would suggest that the employer has to give notice, is there? If there is, maybe you can help me find it. What we cited, Your Honor, is a case called Ackley versus the Department of Corrections. It's Northern District of California. Not to demean that Court, but you've got one case from the Northern District of California, you've got several circuit cases right on point that all say no notice is necessary. Your Honor, I understand that that is the case. The reason why we rely on Ackley is because we believe that that very much goes with the intent of the Act. The Act requires an affirmative action to make an election to take advantage of this 207K because otherwise it's used more as a default. 207K is not a default for any law enforcement agencies. It's an election that has to be made, and in this case, there was no proof whatsoever that that election was ever made by the employer. In fact, everything else, whether it's public or any kind of notice that is internal, leads to believe that that was never the case. Is there anything in the text of 207K which suggests that Congress intended notice as a requirement for taking advantage of that exemption? It requires an election to be made. So that election, we believe, requires some kind of intent to take advantage of this because otherwise it would be a default for any law enforcement. But really, you use the word election. It makes me think that the statute requires you to file a form, for instance, with the Department of Labor saying that we elect to be covered by 207K. But really isn't all that's needed is that the employer establish a qualifying work period. Your Honor, that is correct. They do have to have a qualifying work period. But in the case of law enforcement and in the case of any job, really, what isn't a qualifying work period? A job that's five days on, two days off like mine, that is a qualifying work period. But you don't work for a law enforcement agency. No, I do not, Your Honor. But law enforcement can do two things. They can follow 207A, which is the normal course of things, or they can take advantage of the exception. And the exception, it's an exception for a reason. It's not a default for law enforcement. And that is why we believe that the court in Ackley was correct as opposed to Calvado and the Ninth Circuit, which has indicated that a qualifying work period can be sufficient. Well, Calvado said that Congress specifically considered the kind of requirement that you are arguing for, and they decided not to require it. Well, in Calvado, there was a memorandum, if I'm not mistaken. There was a memorandum which specifically spoke in regards to the FLSA and the exception. And it affirmatively, through a memorandum, indicated that it was, in fact, going to take place within an effective date and gave notice to these employees that that was the case. And notice is something that is required under the Act. What that notice is how sufficient of a notice has been disputed. And in Ackley, the memorandum, which the court found determinative, is very much like the policies and procedures in the manual for our case, which indicate and specifically talks about when, over time, and how it will be paid for FLSA purposes. And it indicates that it's a 40-hour work period. And nowhere in that policy manual, which applies to my clients, the law enforcement, does it indicate that the township ever had any intention to take advantage of this exemption. Do you know of any circuit case or any other district case, for that matter, that agrees with Ackley? No, Your Honor. I can't say that there is any circuit case. Okay. I appreciate that. Maybe you can move on to your other issues. The other issue that we brought up under appeal was the issue of roll call. The court held that the plaintiffs are compensated for the roll call as part of their salary. Now, roll call under the Act, under the Code, is a compensable period of time. However, the court said that the 20 minutes before and 20 minutes, or I should say 10 minutes before and 10 minutes after, thank you, Your Honor, that employees or the police officers are required and mandated to attend roll call is included within their salary. Now, we believe that there was sufficient amount of indicators which make this a completely wrong decision. Wasn't there a custom and practice to include that within compensation? Your Honor, it has been in the contract, but there hasn't been any custom and practice saying that this is part of the base pay. The base pay is based on a 240-hour work period per year, and that divided by the number of tours that either people or officers who work a 6-3 schedule or a 5-2 schedule, it's equal to the amount of, or the average work week, which is 39 and a quarter. If you would add, or if you would make the mathematical computation based on an 8-hour and 20-minute day, that mathematically is impossible. The other reason why we believe they are not compensated is because if you look at their overtime rate, it's not based on an 8-hour and 20-minute work day, it's based on an 8-hour work period. In fact, the chief of police, when we had our depositions, admitted that officers are not compensated for either the 10 minutes before or 10 minutes after they are required to attend roll call. Another great indicator, we feel, is the fact that at the end of their tour of duty, their 8 hours, if they are in fact required to work over the 31 minutes, they are compensated for those 10 minutes. Yeah, but that doesn't help you because it may be that the amount of compensation in the base pay is only the amount which would bring them underneath that ceiling. I understand what you're saying, but that fact doesn't necessarily mean that, well, because if they go to the 31st minute, they're paid for that. They could say, well, yeah, they're paid more for that, but before that first 31st minute, they're also paid, it's just included within the base pay. Well, they're paid at an overtime rate for those 10 minutes at that point. They're not paid a straight time, they're paid for their overtime. So it would be their 8 hours of regular pay, and those 10 minutes would be paid at their overtime rate, again, based on an 8-hour work day. But again, it could be that the contract was drafted so that the time and a half they're getting for the first 30 minutes is part of the compensation. If they go beyond that, that's not part of the contract, and that's where the formula kicks in. I'm not sure that's the case, but you could argue that. My guess is that your opposing counsel is probably going to argue that. And why is that wrong? Your Honor, because the way that we – or they have their contract base pay is based on the 240 hours, not anything more or anything less. Those 10 minutes that are above their 8 hours are not compensable because they're not part of those 20, 40 hours that they work yearly. The third basis is the Donning and Duffing, and Donning and Duffing is not something that has been determined or even considered by the Third Circuit at this point. The appellants relied on two cases out of California, which is Lemon and Nolan. Both of those cases determined that Donning and Duffing for police officers is compensable whether or not they take place in the employer's premises or there is a requirement that requires them to Don and Duff their uniforms in the premises. And in this case, the courts followed the ruling in Alvarez, which held that protective gear is compensable. And in these cases, the court found determinative the fact that the employer provided lockers as it underscores the fact that it's important for the officers to change their uniforms in the department. What part of the uniform is indispensable and integral to police work? Clearly the gun is, the bulletproof vest, the badge. Do you get into that kind of an analysis where maybe the belt is not integral and indispensable? Maybe the shoes aren't? Well, Your Honor, the way that the department has issued their general orders is they're very specific requirements as to what an officer, whether he's a uniform or not, is supposed to wear every day. So you're saying if it's covered in the manual, it's something that they have to wear. If it's something that could be subject to a roll call inspection, you're saying it's integral? Right. And it's very specific. And honestly, it's a lot. When they put on their belt, there's a lot of equipment, whether it's to provide safety for the general public or if it's used for their own protection. One day I thought of it, we are assuming Donning and Duffin come together in the cases of all, handle them that way. Seems to me you could make a very strong argument, putting the uniform on, that is integral and indispensable. Taking it off isn't. You can go home in your police uniform. Well, not really. Why can't you? The reason why we... Why can't you go home in a police uniform? There are a variety of reasons. One is what I need. One, it's the recognition. The recognition that you're a police officer. You're off duty. You leave your weapons in the locker room. But there's no requirement, is there, that you leave your weapons and uniform behind? No, there is no requirement. So if an officer wanted to wear the uniform home, they could do that? They can do that, but they're restricted as to what they can or cannot do while they're in that uniform as well. And what can they not do? They can't go into a place that serves alcohol. They can't hang around what they call loiter. I'm sorry, my time is up. Can I continue? They cannot loiter or engage in political activities, things like that. There is restriction. I didn't want to get home a long day, been out there risking my life all day, protecting the good citizens of Teaneck. I didn't want to get home, have a nice dinner, a glass of wine, watch a ball game and go to bed. Why can't I wear my uniform home? No kids in the house, forget about the gun issue. I'm not sure how big a deal that is. Why can't I wear my uniform home? It's not that you can't, Your Honor. There's no restriction that you can't wear your uniform. So taking it off is not really indispensable and integral. It's putting it on. Putting it on would be more. It would be an argument to be made, yes. Are you familiar with the case, Seventh Circuit case of Sandifer v. U.S. Steel? Yes. And you know that that involves a definition of, or the question of what constitutes changing clothes? Yes, Your Honor. Will a decision in that case have any possible impact on this case? It's the interpretation. We are not just saying that clothes are the shirt, the pants. Our claim is also for the safety equipment, which has been held to be compensable. If you get the shirts and pants answer, if you get the uniform part of it, the rest of it is a slam dunk. And that's really easy. If you have to wear a uniform prescribed by the manual consisting of the shirt, the pants, I guess you have regulation shoes, a hat, then even though the U.S. Steel case does not involve police officers, that really does follow necessarily that there's still an issue. If the shirts and the pants, that part of it is not necessary, then there's another issue remaining about the gun. But if the court says that the uniform issue in that case is integral and indispensable to the employer and therefore compensable, that really answers the question, it seems to me. I'm surprised you didn't mention that case. Your Honor, I can't say why we didn't. I mean, it's the Supreme Court of the United States. Yes, Your Honor. We actually found a case, and this is just in preparation to this argument called Rogers v. City and County of Denver. It's a district court case, and in that case it went the other way, which is the judge found that whether or not officers change their uniform or are required to change their uniform in the premises, it's not determinative for compensability. In fact, the judge said that uniform cannot be considered clothing as it commands a sense of authority or compliance with commands, and the judge in that case said it was not analogous to the judicial role. Further, in that case, the judge said that the uniform also comprises of the safety equipment. What was the uniform? The uniform in that case is most likely the same as the uniform in any police officer. It was a police officer case. So in that case, the uniform also carried all of the equipment which was necessary to protect life and also for the protection of the police officer. And interestingly, in that case, the judge said that 2030, which is what the town argues in this case, is not a persuasive argument indicating that silence is not the equivalent to custom or practice of non-compensability. So, you know, this is a rather new case that has happened after Bamante, which is the case that the district court relied on this case, and we believe that that case also furthers our argument in why donning and doffing should be compensable.  Good afternoon, Your Honors. Angelo Genova, Genova Burns, Newark, New Jersey, on behalf of the Apelli Township of Teaneck. May it please the Court. Nobody have my sympathy. Anybody who loses paper has my sympathy. That's why I use this thing. I can't keep track of paper. I'm kind of beholden to my paper. I'm having trouble acclimating to the new technology. There are six points, Your Honors, that I'd like to emphasize and then respond to any specific questions that you have. And those six points are these. I think it's clear from this record, and this position was on summary judgment and the standard of review, as Your Honors know, nonetheless, is de novo. Most, if not all, of appellants' arguments are predicated on a false assumption, and that is that the Fair Labor Standards Act requires the payment of overtime after eight hours. And replete in this record is evidence of the fact that the appellants have been arguing, predicated on a collective bargaining provision, that overtime is due under the Fair Labor Standards Act, not under the collective bargaining agreement, by virtue of the fact that any time worked after eight is compensable as premium pay. So it's very clear to us, and we would hope to this Court, that Judge Hayden did not err in concluding that there's no cognizable claim that the appellants had in the inception of their action predicated on the assumption that the Fair Labor Standards Act allows for premium pay after eight hours. So that cause of action has no foundation. The next point I'd like to make has to do with the question of whether or not the 207k exemption is applicable here. And I think, as Your Honors indicated, not any conclusion, but your questions raised the central issue, and that is whether or not that statute, its legislative history or otherwise, compels a finding that notice is required, and anything more than the fact that, in this case, for well over 20 years, if not 30 years, the Township of Teaneck has been operating under a schedule which would otherwise qualify under 207k. And there's no dispute that that schedule has been in effect, and on this stipulated record, the appellants have conceded that that schedule has been in effect. And in addition, there's no dispute that the second prong of that test under 207k, which is that these be law enforcement employees, is satisfied. So the central point that has been made by the appellants is somehow this court should abandon what has been the overwhelming authority to the effect that there's no official notice election, as my colleague would characterize it, that is required in this circumstance. And it's our contention that this court should adopt the Ninth Circuit's conclusion in Calveo that such a notice requirement is not compulsory, it's not grounded in the legislative history, it's not grounded in the plain meaning of the statute, and our other circuits have indicated that it is not required. On the issue of the third point that my colleague did not raise, but I would like to raise, and that is that also on this record below, and your standard is nonetheless de novo, but on this record below, it's self-evident and clear that the plaintiffs have failed to meet their burden of proof, which is to establish damages that flowed from the alleged violations of the Fair Labor Standards. I'm just curious about it, because if you come up with a way of keeping, they're not required to punch a time clock, if the township decides not to put in place a way to keep track of their time, why should they be penalized for the fact they can't prove their time? Well, I won't accept that assumption that the township has not kept a record of or maintained a methodology to keep a record of its time. We have these daily blotter acts. Actually, there are five things that were provided to the plaintiffs in the course of this proceeding that would have allowed them, if they chose, putting aside that the cases are clear that one can simply testify as to the fact that one works. I mean, we cite cases in our brief for the proposition that they could have chosen to proceed not by way by stipulation, but could have gone to court and simply at a trial had someone get on the stand and say, I worked next day and did such and such. But in this particular case, not only did we have the daily blotter that was provided to them, we had the tour sheets that were provided to them, we had punch time cards that captured all over time. There was a computerized system for dispatch records where one could calculate when one was dispatched to a location or not. That wouldn't tell you when the person got there, though. No, but I would say that the aggregation of all of these things, put another way, Your Honor, there was not insufficient records to allow one to extrapolate, to render an estimate as to what the damages would be, which I think is the ultimate legal test. And the burden under the case law is not particularly onerous. The courts have recognized that plaintiffs in Fair Labor Standards Act cases can make estimates. They have to be grounded on some evidence, but can make estimates, including the testimony of individuals, and then the burden shifts to an employer like TNAC. In this case, had that happened, then these records would have been the basis for rebuttal. But in addition to the CAD system and the records retention systems, the fifth category is the full unit status record. So the point, Your Honor, that we make is that there were sufficient records. They chose not to extrapolate. I think the court, Judge Hayden, recognized that the sole evidence, if you will, that was proffered was a self-serving report that was provided by the wife of one of the plaintiffs where she sought to extrapolate or estimate damages, going back to my first point predicated on the notion that overtime was required after 8. And again, there's a distinction between claims that might be brought under a collective negotiations agreement where arguments might be made that the agreement was violated, but we're here under the Fair Labor Standards Act and they've exercised legitimately their rights under the Fair Labor Standards Act to try to assert that claim. On the issue of the roll call, that really goes back to Judge Hayden's interpretation of the collective negotiations agreement and we believe that she interpreted properly the collective negotiations agreement for the proposition that the parties, in fact, had negotiated and there was an understanding that that roll call time was folded in part of the wage rate. What is the understanding? Where does that come from on the record? That comes from the collective negotiations agreement itself. The collective negotiations agreement speaks in terms of an 8-hour shift, but it also speaks in terms of a 20-minute 10 before 10 after muster time, so it's grounded in that record. And the last two points, on the issue of donning and doffing, your honors in your questions identify the standard. Is it integral? Is it indispensable? Is it required? Is it necessary? But beyond that, I think Judge Sloviter, you in an Eastern District, in a case called Desencio, I think it was back in 1994, dealt with this issue and also talked about elements of control as well. And here we have a factual record where it's optional. If you compare the Bomanti case, which we rely upon, to the facts of this record, you'll find the striking similarities between the facts in Bomanti as they relate to the uniforms worn and the donning and doffing issues there and the concerns raised by the police officers here as to whether, in fact, those concerns rose to the level of necessity or indispensability. And you'll find when you contrast them with this record that they're identical and that the Bomanti factors under this record have been satisfied. And it be our contention that that should be the standard. Is there a requirement, I take it, in TNIC that officers always be armed? I think Philadelphia has a requirement that police officers are always basically uncalled for. I don't know the answer to that, your honor, whether or not they're required to always be armed. My suspicion is no, but I don't know the answer to that. It's a suburban-type community, suburban-urban. I guess the best example I give is as Haddonfield is to Philadelphia, TNIC is to New York. Where is TNIC? TNIC is in Bergen County, New Jersey. It's about five miles west of the George Washington Bridge. Right off of, for those of you who know, the Garden State Mall. All I know is where the wine stores are. Now that I buy and bring it across the bridge, I just happen to know where they're located. The last point I'd like to make that was at least argued in the brief, and I would like to respond on the record, is this whole notion of what the cases talk about as gap time, where there's an allegation here that there's a failure to satisfy the minimum wage requirements of Section 206 of the Fair Labor Standards Act. The argument that's being advanced by the appellants is legally defective because the case law that we cite says that you never can get to a question of a minimum wage violation if, in fact, you haven't established in the record that you've worked the overtime. In other words, the question of minimum wage, the courts have said, first requires a plaintiff or, in this case, the appellant to establish that they have worked sufficient hours to qualify for overtime, and then to look back on whether or not they got in straight time the minimum wage is really a mathematical calculation. So applying that here, if plaintiffs had established below that they worked the threshold under 207k here for a 5-2 schedule, which is 43 hours, they first have to establish they worked the 43 hours, then the mathematical calculation is did they, in their compensation, when you divide that compensation by 43 hours, get over the minimum wage threshold, and one, we believe they did, but two, you never get to the question because they haven't established that they worked the 43 hours qualifying for overtime. Unless the Court has any specific questions. It would be helpful if you could cite to the provision in the language and I'm so used to saying collective bargaining agreement. It's the first time I've seen a CNA use, but the collective agreement as to where the base pay is intended, it's clear the base pay is intended to include the muster time. That would be helpful. Take a moment here, Your Honor. And if not, you can submit that after you're done. Okay, Your Honor. I was going to ask if you had no objection to that. Does the Court need me to speak to the Ackerley decision and distinguish that? The one from the Northern District of California?  I love the Northern District of California. It goes with what I said earlier about my knowledge of the wine stores over there. Right, so in the Sonoma Valley, Your Honor. Yeah. Could the decision of the Supreme Court, if they found for Sandifer against U.S. Steel, could that impact this case? I'm not familiar with the case, but there is a case here in the Western District of Pennsylvania that is somewhat similar. I don't know if Your Honor is familiar with it. It's called Andranko. It's cited in our brief. And the question was what constitutes clothing within the meaning of donning and doffing. And it involves steel workers. And in that case, the Court held that changing clothes in that circumstance was excluded from compensable time, even though the union had argued that it was specialized protective work gear. So I think it's going to turn on, you know, it could have an impact. My point is, could it have an impact? Yeah, I think it could. Not to say how they're going to decide. I think it could. But what I'm saying is that, you know, is it specialized and what makes it specialized? I understand that. There's a difference. Obviously, there's a difference between steel workers. Yes, it could have an impact, Your Honor. I think it could. But I don't think it would be dispositive. But, again, I don't want to talk out of school. I haven't read the case. Thank you very much. Thank you, Your Honor. Did this save time? Did she say a little bit? Okay. Two minutes. Your Honor, I just want to go back to the burden of proof point that my adversary has brought up. And he indicated that there were at least five ways that could have been, five things that could have aided us in getting a calculation for the damages.  A 2004 memorandum that was issued in this case tells or mandates how the time... Issued by whom? Issued by the, I believe it was the administrator. Or it could have been the police chief. The police chief, if I'm not mistaken. He indicated how the time for police officers is going to be maintained, and that's the way it's still being maintained. That's a little different, though. To say that the way it's being officially maintained for purposes of payment under the collective agreement is not the same as I think Mr. Genova is arguing that for purposes of litigating what your damages are, there are common sense things you can do to establish what your time is. Now, it may not be that you'd be paid under the agreement for that, but in terms of your damages, you can show high testimony even. You can say I was there that week. I remember I was there. We believe that the records were sufficient. The records that we used in this case were the blotter sheets. And the blotter sheets indicate that an officer came 10 minutes before his shift started, or later, if he did in fact not come to work 10 minutes before, and that he left 10 minutes after his tour ended. If the person leaves, we didn't say they are allowed to leave. As I understand it, there's no requirement. Someone is not doctored. They decide to leave before that. The 10-minute time afterward is roll call time. Right. The person is allowed to leave before that 10-minute period gets there. Yes. If roll call or the muster time ends before those 10 minutes, if their reports are completed, if the information has been sufficiently passed along to the next officer that's going to take the shift, they can leave before that time. But the blotter sheets will always indicate that they left at 10 after the hour. What the blotter sheets will also not indicate is whether the officer spent 20 minutes, 25 minutes, 28 minutes, 29, 30 minutes after the end of his tour completing reports or engaged in another kind of activity such as school posts. That time is not indicated in the blotter sheets. The only time that will be indicated is if that officer was the 31st. I don't know what they're called in Teaneck. In Philadelphia, they're called 78s. It's a ped stop. An officer encounters somebody on the street, fills out a very short 5x7 tablet. It's the person's name, a very brief description of the accident. What happens if at the end of the shift there have been four or five of these pedestrian encounters? The officer decides that he or she is going to fill those out at home. I'm assuming that the officer would not get the right to add that 20 minutes or so that he or she took to fill that out at home just because they're doing work-related duties, right? They're not paid for that. No, that's not the case. If they are involved in something like that and the tour commander requires them to fill out that report after their shift, they will sit there and write that report. If they do it in the station, they get paid. But what if they decide to do it at home? Are they allowed to? I don't believe that that's the case. They're not allowed to. The reports are done in the headquarters on a computer through a system. So that system is not something that they can do at home. It's a computerized system that every report goes through. TINAC is way ahead of the city of Philadelphia then. I believe so. So that was what we used for our calculations. We didn't try to speculate how many times an officer in the last four years has stayed those minutes after the ten minutes that they are in the blotter sheet as being let go from their duty because it's not recorded. It's not recorded in their time, in their punch cards for overtime. And to argue that we can go back to dispatch records, which are... He's not saying only dispatch records. He said the officer would get on the witness stand and testify him or herself. There may be a dispatch record. He said there were a lot of different ways that in individual cases, like a menu A, menu B, menu C, and you take what fits that circumstance to show that you were working there. We're talking about years and years of work, and that's the assumption that an officer has kept, you know, a daily record of exactly how much time every time they've gone under the assumption for this long that, well, it's not compensable, so why would they ever keep those records? And there's not one plaintiff that could have gone and said, in August 23rd of 2009, I worked such and such time, and I wasn't compensated. It would just be an impossible feat. Okay. Thank you. Thank you. Thank you very much. We'll take a minute. I have a record reference that you have right there. Oh, okay. It actually appears on page 13 of our brief. It is, and I didn't characterize it properly, it emanates from an arbitrator's interpretation. Okay. It appears on page 13. The record reference is our appendix A103, page 103, and it would be the statement of facts that is the document of paragraphs 252 and 253. Great. Thank you. Thank you. Okay. It's making me sad. I'll take a minute on your advisement. Thank you very much.